On Rehearing.
 

 HIGGINS, Justice.
 

 This is a suit by a wife against her husband for separation from bed and board on the grounds of alleged cruel treatment. Defendant admitted that they quarreled but denied he was guilty of cruelty, and
 
 *701
 
 pleaded in bar that his wife was equally responsible for their difficulties.
 

 There was judgment in favor of the plaintiff granting the separation and awarding her the custody of their minor daughter and alimony. The defendant appealed.
 

 We affirmed the judgment, but on the defendant’s application, granted a rehearing.
 

 While the pleadings set up specific offenses, in the trial of the case the issues were broadened by the introduction of evidence, which was not objected to, that covered the entire span of their .eleven years of married life, which began on June 17, 1926. About one year after their marriage, while on a weekend party at Bogalusa with two other couples, as the guests of mutual friends, someone suggested that the group, consisting of four couples, attend a public dance. After they were there awhile, certain strange men began “breaking the couples” and one of them danced with the plaintiff. The defendant objected to his wife dancing with a strange man, and particularly one who had been drinking and who'held his wife in a way that was objectionable to him. The wife did'not share his view and pointed out that others were doing the same thing. Thereupon, he insisted that she leave the' dance and the other couples left with them. The evidence is in conflict as to whether it was originally intended that plaintiff and her husband spend the night in the home of their host and hostess or at a hotel, the wife stating that they were to remain at the home and the husband testifying that they were not, because the home did not have accommodations for all the couples, and they, being the only guests married, defendant insisted that they sleep at the hotel. The plaintiff claims that she was humiliated and embarrassed by the ugly conduct of her husband, under the circumstances.
 

 On a subsequent occasion, the date of which is not made clear, plaintiff and two of her witnesses testified that they went to get ice cream and she ordered a particular kind, but when her husband brought her the ice cream, it was not the flavor she requested;, that when she told him she had ordered a different kind of ice cream, he “flew into a rage” and threw the ice cream cone away and said, “why in the hell don’t you make up your mind what you want”, much to her chagrin and humiliation.
 

 Another incident complained of, concerning which the date is not definite, is that while they were attending a cocktail party and dinner at the home of mutual friends, during the course of conversation, someone remarked that some men would eat bacon and eggs 365 days out of every year without complaining, but that “John (the defendant) would raise the devil about such a thing”. It appears that on that morning the plaintiff and the defendant had an argument about bacon and eggs for breakfast and defendant, being under the impression that his wife had told some of her lady friends of the occurrence, “flew into a rage” and said that if his wife “kept her damn mouth shut about their domestic affairs, they would get along better”. Plaintiff claims that this deeply wounded her feelings and embarrassed her in the presence of her friends.
 

 
 *703
 
 It is also, charged that during one summer, plaintiff, defendant and another married couple, who had one child, rented a house at Hammond for a month; that the husbands came to New Orleans each day to work and returned to Hammond at night; that the other couple invited a gentleman friend to spend the month with them and he accepted; that one evening while the plaintiff was playing bridge, her husband asked her to trim his finger nails and she requested him to wait until she finished the game, but he refused to do so and “flew into a rage” and bawled her out in the presence of her friends, and that night refused to permit her to sleep in the bed with. him and ordered her to use a cot in the living room; that the other two-men told him that he should occupy the cot and his wife the bed, if he did not want her to sleep with him.
 

 Plaintiff and two of her witnesses also testified that one evening after a dinner party at Maylie’s Restaurant, in the City of New Orleans, the parties went to the home of a friend in Metairie Ridge, where cocktails were served; that the defendant, in attempting to pass his wife with a glass of wine in his hand, spilled some of it on her dress, and when she told him to look where he was goihg, he told her to “go to hell”, which caused her to repair upstairs and cry; that after the party, the plaintiff and defendant, together with one of his employers and a co-worker and their wives, drove home in his employer’s automobile and everything was peaceful until the co-worker and his wife got out of the car at their residence; that thereafter the defendant renewed the quarrel, calling his wife vile names and acting in such a violent manner that it was necessary for the employer to admonish him that unless he desisted, he would put him out of the car; and that upon arriving at the defendant’s home, while on the sidewalk, he again, in a loud voice, resumed the argument and after entering his house he continued fussing, frightening his wife and little girl to such an extent that it was only after his employer threatened to take them home with him, or remain there for their protection, that he behaved and quieted himself.
 

 The defendant denies that he was guilty of abusing or ill-treating his wife, and his co-worker, who was in the automobile and at the parties in Maylie’s Restaurant and Metairie Ridge, testified that the defendant was sober and had demeanored himself as a gentleman and had in no way been offensive while in his company.
 

 Another complaint against the defendant is that one evening he and the plaintiff went to the Suburban Gardens with a man and his wife, who were good friends of theirs, and that while dancing with his wife, the defendant started to stomp (dance) ; that upon his wife protesting that the noise was making them conspicuous, “he flew into a rage” and stopped dancing, grabbed her by the arm and violently pushed her across the floor to the table where they had been seated, and began fussing at her in the presence of their friends, causing her considerable embarrassment.
 

 Plaintiff testified that, in the presence of their little daughter, her husband called her vile names and accused her of miscon
 
 *705
 
 duct, and generally abused her and said he did not love her and would have nothing to do with her. Her statements in this respect are uncorroborated. The defendant denied that he made these statements or demeanor-ed himself in that manner.
 

 Plaintiff states that on several occasions, because of the violent temper of her husband, and fearing bodily harm, she was compelled to leave her home in the early hours of the morning with her child and go to the home of friends, and that when she returned without the child, he refused to let her have her clothes until she brought the baby home. Her statements as to what transpired in the house are uncorroborated, but her friends did testify that she telephoned and asked them to come and get her, as she was afraid of her husband.
 

 Several of the plaintiff’s witnesses testified that the defendant assumed an ugly and sarcastic attitude toward his wife generally while they were in company with others. A number of equally reputable men and women, friends, neighbors and relatives, testified that on the occasions when they were with the plaintiff and defendant, he behaved himself properly.
 

 The colored maid, plaintiff’s witness, who worked in their home for a number of years, testified that when the husband came home and found things were “not right”, he remonstrated with his wife and she usually replied in kind and an argument ensued. She states that the quarrels were over the usual trivial matters that arise between married people — she termed it “friendly fussing”.
 

 An- attorney, defendant’s witness, who had been married twenty-six years and who lived next door to these parties, stated that his room was within twenty feet ,of their home, and that while there was frequent bickering between them, it was amusing to him, because of the inconsequential nature of the disputes and the fact that the wife was better on repartee than her husband. He stated that both parents were devoted to their minor crippled daughter, who had suffered an impairment of the function of the use of her left leg due to infantile paralysis when she was two years old, and that, from the manner in which these parties conducted themselves in the neighborhood and in his home, he regarded her as a good wife and him a good husband, and that he was surprised when he learned that she and her little girl Had left home.
 

 The major part of the testimony of these two witnesses is corroborated by the evidence generally, which shows that during the last two and one-half years in which these parties lived together, the quarrels were less frequent and less serious than those that proceeded them.
 

 It is extraordinary, to say the least, that if the quarrels and arguments in the privacy of their home were not violent that defendant would wait until he was in a public place'or had an audience of friends and acquaintances to stage a scene by flying into a rage.
 

 The plaintiff admitted that her husband worked regularly in a clerical position for the same concern for about fifteen years and that in his spare time he studied to be
 
 *707
 
 come a Certified Public Accountant; that they were buying their own home; that he provided the family with an automobile; that she had an adequate wardrobe, consisting of a number of dresses, hats, shoes and accessories; that during the entire time of the illness and unfortunate condition of their child, he provided the best of medical attention and used every means possible to restore the child’s health and her leg to a normal condition, but without satisfactory results; that they received many invitations to attend parties but her husband embarrassed her on a number of occasions by declining to accept them; although her testimony shows that they went out frequently; that while in their home she accused him of spending some of his money on another woman, she said “in my heart, I did not believe it”; that he forbid her to continue associating with a married woman they had known for many years, because he became suspicious that this woman’s conduct with a certain man, who was a friend of her husband, was not proper, and that she was using the plaintiff as a screen to shield her indiscretions; that she denied that this woman had been guilty of any wrongdoing and refused to give her up, causing repeated altercations between them; that on one occasion she concluded he was about to strike her and she scratched, bit and kicked him; that when the arguments became violent, she would telephone the wife of one of her husband’s employers, who would send her automobile and she would leave him and stay at their home until the next day; that her husband forbade her to see a certain male friend of her sister, who had been an intimate friend of the deceased brother-in-law, but that she disregarded his wishes and,drove this gentleman in her husband’s car, accompanied by her eight year old daughter, to to the Chalmette Cemetery, where they placed flowers on the deceased brother-in-law’s grave, as instructed by her sister, who was then living in California; that they took kodak pictures of the grave and of themselves and returned to the city about 6 o’clock p. m.; that this gentleman gave her passes for herself and minor daughter to the picture show and met her on Canal street and accompanied her and her little girl to the picture show at her invitation; that a few days later, while her husband was at work, this party came to her home to bid her goodbye, because his position with the Naval, Department required him to go to Boston, Mass., and, on that occasion, he remained in the house about twenty or twenty-five minutes, her daughter and the negro maid being present; that she disregarded her husband’s instructions, because she could not see any harm in going out with this friend of the family; and that not having any more children had caused considerable disagreement between them.
 

 The defendant testified that he had earned a salary of $345 per month, but due to the depression his salary had been reduced to $245; that he was seeking to improve his earning capacity by studying to be a Certified Public Accountant and spent a considerable number of hours studying with his brother, who was similarly interested; that the reason for declining many invitations to attend parties, outings and dinners was because he felt obligated
 
 *709
 
 to reciprocate and his income, when considered in connection with his obligations, did not justify him in spending a lot of money for pleasure; that his wife frequently played bridge and neglected some of her household duties; that she continually complained of his attempted restrictions on her social activities; that she discussed her domestic troubles with her friends and defendant’s employers, causing him considerable concern and worry about his position; that on one occasion she became so angry, she .threw a plate at him, and another time severely scratched, bit and kicked him, without any provocation; that after having had ample opportunity to observe the conduct of one of her lady friends, he concluded she was using his wife as a screen to shield an apparent love affair with another man, and that when he objected to his wife either visiting the woman’s home or having her visit their home, she declined to abide by his request, precipitating a great many quarrels between them; that it was only after he accidently discovered a letter addressed to the plaintiff by her sister, who lived in California, in which she advised her to be friendly with her former friend “George”, as he was “loyal”, and to go out with him, if she could get away from John (the husband), which letter plaintiff did not show to him, that he became suspicious; that, because of his wife’s refusal to comply with his request and not see this man, his confidence became shaken and he employed detectives to shadow her and inform him what was going on between them; and that the reason he did not reconvene for a separation was because he was not convinced that his wife had been guilty of any wrongdoing and was willing to make any sacrifice which might be conducive to the comfort, care and happiness of his crippled child.
 

 It is unnecessary' to narrate the evidence given by the three detectives, because the wife practically admitted their statements, except as to the length of time “George” remained in defendant’s home. This testimony substantially coincides with that given by the plaintiff’s witness, a colored maid, who was in the house at the time “George” visited there, she giving the additional information that he ate lunch there.
 

 While the plaintiff’s lady friend and her husband denied that there were any improper relations between her and the gentleman friend of the family, and that the husband had confidence in his wife and his friend and was satisfied that they had not been guilty of any indiscretions and had no objections to their associations, nevertheless the defendant had the right to advise his wife that he did not share in their broad-minded view and would prefer that she select as her companions women who were more conservative in their attentions to the opposite sex. The defendant was not concerned as to the attitude of other men in permitting their wives to have male friends, but it was his right to object to his wife associating with any one who would tend to impress upon her the idea that her husband was acting arbitrarily and unfairly in denying her similar privileges. Surely the husband had the right to insist that it would be a safer and wiser course not to permit unnecessary temptations to be placed in his wife’s path.
 

 
 *711
 
 In the case of Gormley v. Gormley, 161 La. 121, 122, 108 So. 307, 308, this Court said:
 

 “Under our law, disappointment in the marriage relation and mere incompatibility of temper are not causes for a judicial separation between the spouses; excesses, outrages, and cruel treatment are, but always with the qualification that the complainant must be comparatively free from wrong.
 

 “Where the faults of husband and wife, are nearly balanced and are of a similar nature, neither party can be heard to complain in a court of justice. Durand v. Her Husband, 4 Mart. (O.S.) 174; Rowley v. Rowley, 19 La. [557] 571; Naulet v. Her Husband, Dubois, 6 La.Ann. 403; Trowbridge v. Carlin, 12 La.Ann. 882; Castanedo v. Fortier, His Wife, 34 La.Ann. 135; Amy v. Berard, 49 La.Ann. 897, 22 So. 48; Ducros v. Ducros, 156 La. [1033] 1034; 101 So. 407; Snell v. Aucoin, 158 La. 767, 104 So. 709. * * *
 

 “Counsel for the parties have argued •that the matrimonial relation is so strained as to render 'their living together impossible, and, with much earnestness, have urged upon us' the advisability of putting an end to the unfortunate situation by entering up a decree in favor of their respective clients. We are unable to do this. The question with this court is not whether it is best for the parties, or for society, that they should be judicially separated, but whether they have brought their case within those provisions of the law which regulate the most important relation of social life. Cooper v. Cooper, 10 La. 249.”
 

 See also Scott v. Scott, 27 La.Ann. 594.
 

 Much has been said about the defendant’s alleged defamatory testimony, particular reference being made to his reasons for instructing his wife to forego the friendship of the married woman, whose association he did not approve; his wife’s actions in not having any more children; and his employment of detectives to report to him their observations of the conduct of his wife with “George”. We find nothing in the defendant’s answers to the original and supplemental petitions of a libelous nature. The alleged slanderous statements of the husband were elicited by counsel for the plaintiff on cross-examination in endeavoring to determine the reasons for their difficulties. At the outset the defendant refused to divulge certain information, stating that he would rather lose the case than to harm innocent parties, and it was only upon the plaintiff’s insistence that the court ordered some of these questions answered, the names of the parties being kept out of the record.
 

 In regard to the fact that the parties did not cohabit during the last two or three years they lived together, the wife admits that they occupied separate rooms by mutual consent and that she would have refused his requests for indulgence, if any had been made. She attributed her lack of interest and indifference to the quarrels between them and her refusal to bear children because of the care required by her crippled daughter. It -was shown that the child and mother enjoyed good health. He justified his abstinence because his wife refused to bear him any more chil
 
 *713
 
 dren. One of the primary considerations for entering into the sacred bonds of matrimony is to have children and neither spouse, under normal and ordinary conditions, has the right to decide that there will be no offspring of their union. There are no exceptional circumstances in the instant case other than the child’s physical impairment, which was not a sufficient reason for her decision.
 

 As far as the wife going out with a male companion and entertaining him in her home, against her husband’s will, even though she would not be guilty of any wrongdoing and could see no harm in it, such conduct evidences a lack of interest in her husband and her home and invites suspicion, promotes jealousy and destroys confidence. Such behavior on the part of. a wife is a matter for gossip even in Hollywood.
 

 While the evidence in this case tends to show that the husband was irritable and abusive on occasions, nevertheless, it appears that the wife was as inconsiderate of him and was equally responsible for their domestic difficulties. Certainly, it can not be said that the plaintiff was “comparatively free from wrong”. If she had heeded the advice, and counsel of her husband instead of listening to friends, who were much less solicitous of her wellbeing than he was, this matter would not have found its way into the courts.
 

 For the reasons assigned, it is ordered, adjudged and decreed that our original opinion and decree are recalled, the judgment of the lower court is annulled and set' aside and the plaintiff’s demands rejected. Plaintiff’s right to a rehearing is reserved.
 

 O’NIELL, C. J., is of the opinion that, the decision rendered originally by this court, affirming the judgment appealed from, should be adhered to.
 

 PONDER, J., dissents.